(Decided 4th June, 1868.)

PETER GREENWOOD *vs.* JOSEPH GREENWOOD.

*Pleading and Evidence in an action on the case, Per Quod Servitium Amisit — The right of a Father to maintain an action for the Seduction of his Daughter under age, although not Living with him at the time of the offence — The age at which the Legal control of a Father over his Daughter ceases — The Weight of English Decisions since the American Revolution —*

Greenwood *vs.* Greenwood.

*When previous Decisions of this Court should be Disturbed—Power of Courts of Equity over the Parental relation—How Statutes are to be construed.*

In an action on the case by a father for the seduction of his daughter, under twenty-one years of age, *per quod servitium amisit,* the relation of master and servant, at the time of the seduction, must be averred in pleading, and established by proof.

A father may maintain an action for debauching his daughter, under age, *per quod servitium amisit,* although she was not living with him at the time the offence was committed, unless by some act of his own, he has destroyed the relation of master and servant, which the law implies from the legal control he has over her services.

The legal control of a father over the person of his daughter, and his right to her services continue until she attains the age of twenty-one.

Decisions in England, pronounced since the American Revolution, while entitled to the greatest respect, are not binding authorities upon this Court.

Previous decisions of this Court should not be disturbed, except to settle some rule of property, which the public interest requires to be reviewed, or unless it is plainly seen that glaring injustice has been done, or some egregious blunder committed.

Courts of Equity have ample power to interfere with the parental relation, when a proper case for its exercise is presented, and when it becomes necessary for the safety, protection and obvious benefit of the child. They will not suffer parental authority to be abused, nor the infant's property to be wasted or destroyed in the interval between the age of eighteen and twenty-one, though there may be no provision for the legal guardianship of such property during that period.

Statutes are to be construed in reference to the principles of the common law; for it is not to be presumed that the Legislature intended to make any innovation upon the common law, further than the case absolutely required    The law rather infers that the Act did not intend to make any alteration, other than what is specified, and besides what has been plainly pronounced.

APPEAL from the Circuit Court for Howard County.

This was an action on the case, against the appellant, brought by the appellee, for the seduction of his daughter, under twenty-one years of age, *per quod servitium amisit.*

This suit was instituted in the Circuit Court for Carroll county, and thence removed, upon the suggestion of the appellant, to Howard county, where it was tried before the Hon. PETER W. CRAIN, Special Judge. From the evidence adduced at the trial, it appeared that the appellant's mother, who was a very aged woman, and the aunt of the appellee, early in 1861, sent to the house of the latter and requested the mother to allow her daughter to go to the aunt's house and assist her in her domestic labors, until her servant girl, then absent, should return. The mother, with the assent of the appellee, sent the daughter accordingly, nothing at the time being said about wages. In about four weeks, the servant having returned, the daughter went home, and the appellant, when she left, paid her at the rate of seventy-five cents per week, and of such payment the appellee had knowledge, but said nothing about it. About three weeks thereafter, the aunt again requested the daughter to be sent to assist her as before. The daughter was reluctant to go, but her mother and father persuaded her, and finally induced her to consent, the latter saying she ought to do what was in her power to promote the comfort of his old aunt, who would take the same good care of her as he and her mother would, at home. At this time also, nothing was said about wages, but the appellee and his wife expected or supposed that the aunt would pay for the services of their daughter, at the same rate as previously, for whatever time she might remain. She went accordingly, and remained with the aunt for more than two years, coming home, however, to her father's house nearly every week. During this period the appellant paid her at the rate of seventy-five cents per week. She was seduced by him whilst so residing at his mother's house, in November, 1862, being at that time nineteen years of age; and the child was born in August, 1863, at her father's house, whither she had returned on the 1st of July preceding. The father never required her to pay him the wages she so received, but allowed her to keep the same for spending money, to aid in

clothing herself and otherwise promoting her pleasure. His object in permitting her to go to his aunt's was that she might contribute to the comfort of his aged relative with whom he thought she would be as safe and well cared for, as if she were at home. Each of his daughters had occasionally gone out for short periods to service, and such was the practice with all. He never parted with his legal control over any of his daughters for any space of time, nor did he consent at any time that this daughter should be relieved in any respect from his legal control over her as a father; he claimed at all times the right to recall her home, and have her services whenever he might think proper.

The defendant, after the testimony was closed, prayed the Court to instruct the jury that there was no legally sufficient evidence to show that at the time the plaintiff's daughter was debauched by the defendant, she was actually the servant and in the employment of the plaintiff, and that the relation of master and servant existed between him and his daughter. This instruction the Court refused to give, and the defendant excepted. The jury rendered a verdict in favor of the plaintiff for $7,000 damages and costs, and judgment was entered therefor. The defendant thereupon appealed to this Court.

The cause was argued before NELSON, STEWART, BRENT, GRASON, MILLER, ALVEY and ROBINSON, J.

*Thos. Donaldson* and *Joseph M. Palmer*, for the appellant:

The action *per quod servitium amisit*, by a father for the seduction of his daughter, has caused much discussion, both in England and in this country. The precise questions involved in this case, as presented by the pleadings and evidence, have never been decided by the Court of Appeals of this State; they are open questions, and now, for the first time presented to this Court for its consideration and adjudication. They are important questions, and require a careful examination, and serious consideration to enable the judi-

cial mind to come to a correct conclusion. The questions in this case, arise upon the pleading, evidence and defendant's prayers; and the main question is this, whether there is any evidence legally sufficient, to prove that the relation of master and servant actually existed, at the time of the alleged seduction? The action, according to the teaching of all the authorities, is founded upon the relation of master and servant, and not upon the relation of parent and child, and the *gist* of the action is the actual loss of service. It is a fixed and well settled principle of the common law, by which this Court is to be governed, that as the action is founded upon the loss of service, which must be alleged in the declaration, and proved at the trial, the relation of master and servant must have existed at the time the injury alleged was committed, and the circumstance of the daughter having been under age, at the time, will not dispense with the necessity of this proof. There must be proof of some service, to sustain the action. It is admitted that in some cases, the relation of master and servant may be inferred from slight circumstances, but in this case, there is not a particle of evidence, from which such a relation can legally be inferred.

It is indisputably clear, that by the common law, this action cannot be sustained, without some proof of the relation of master and servant, and the loss of service. The English authorities on this subject, both ancient and modern, fully sustain these legal propositions, and this Court, with due respect, is bound to respect and decide according to the common law of England, unless altered and changed by the General Assembly. The English authorities conclusively settle this question. 2 *Selwyn's N. P.*, 292; 3 *Stephen's N. P.*, 2352; *Postlethwaite vs. Parkes*, 3 *Burr. R.*, 1878; *Bennett vs. Allcott*, 2 *Term R.*, 166; *Russel vs. Corne*, 2 *Ld. Raymond*, 1032. An action will not lie by the father for the debauching of his daughter, unless she be under age and under her father's roof at the time, and in his employment. *Dean vs. Peel*, 5 *East. R.*, 45, *and note (a) page* 49.

It may, perhaps, be safely admitted, that in the case of an infant daughter living with the father as a member of his family, under his care and protection, when debauched, the father might sustain an action *per quod*, &c., without the proof of *actual* service rendered, upon the principle, that in such a case services would be presumed. This is as far as the English Courts have ever gone. *Fores vs. Wilson, Peake's N. P. Cases*, 55; *Maunder vs. Venn*, 1 *Moody & Malkin*, 323, (22 *E. C. L. R.*, 323); *Holloway vs. Abell*, 7 *Carrington & Payne*, 528, (32 *E. C. L. R.*, 615); *Carr vs. Clarke*, 2 *Chitty R.*, 260, (18 *E. C. L. R.*, 328); *Hall vs. Hollander*, 4 *Barnewall & Cress.*, 660, (10 *E. C. L. R.*, 436); *Blaymire vs. Haley*, 6 *Meeson & Welsby*, 55; *Davies vs. Williams*, 10 *Adol. & Ellis*, (*N. S.*) 725, (59 *E. C. L. R.*, 723); *Eager vs. Grimwood*, 1 *Exch.*, 61; *Grinnell vs. Wells*, 7 *Man. & Grang.*, 1032, (49 *Eng. C. L. Rep.*, 1032.)

I suppose this Court has neither the power nor disposition to depart from the English rule upon this subject. By the third Article of the Declaration of Rights, " the inhabitants of Maryland are entitled to the common law of England, and the trial by jury, according to the course of that common law," &c. This provision of the Bill of Rights is obligatory upon the Courts of this State, and the Court of Appeals have always, since its adoption, adhered to it with great tenacity, as fully appears by the Maryland decisions upon the subject. *The State vs. Buchanan, et al.*, 5 *Har. & John.*, 317, 355, 356, 357; *Dashiel vs. The Attorney General*, 5 *Har. & John.*, 401; *The State vs. The Bank of Maryland*, 6 *Gill & John.*, 226; *Cooke vs. Husbands, et al.*, 11 *Md. Rep.*, 503.

The American decisions on this subject are very conflicting, some of them fully sustaining the English common law, while others have widely departed from it, and have adopted *new* rules and principles *in violation of the common law*, by which the action can be sustained. The American decisions which have departed from the common law rule, are entitled to but little if any consideration by this Court. To under-

take to examine all the American cases on this subject and extract from them the real principle decided by them, would be a useless and unprofitable task; for when done, it would not, and could not aid this Court a particle in its deliberations upon the questions involved. The Supreme Court of New York, was the first that widely departed from the common law rule, and attempted to adopt a new rule of action. In 1812, that Court decided the case of *Martin vs. Payne,* 9 *John.*, 389, which was a palpable departure from the common law rule, and which has, without doubt, caused much of the conflict in the opinions found in the American cases upon the subject. The Courts of New York followed and acquiesced in the erroneous doctrine declared in *Martin vs. Payne,* until the year 1850, when Chief Judge BRONSON, of the Court of Appeals of New York, in the case of *Bartley vs. Richtmyer,* 4 *Comstock,* 43, reviewed with great ability and legal learning, all the cases upon the subject, and defined with great clearness the true principles upon which the action of seduction is founded, that is, there must be the relation of master and servant, and the actual loss of service. In the case of *Dain vs. Wycoff,* 3 *Selden,* (*N. Y.*,) 191, 194, the same Court decided the precise question now contended for in this case, clearly adopting the rule of the English common law upon the subject, regardless of the case of *Martin vs. Payne,* and the other New York cases which followed it. *Knight vs. Wilcox,* 14 *New York R.*, 413; *Hewitt vs. Prime,* 21 *Wend.*, 81; *Lee vs. Hodges,* 13 *Grattan,* 726.

It seems to be a well settled principle, that the father has the benefit of his childrens' labor while they live with and are supported and maintained by him, and no longer; for the father may, by agreement, either express or implied, with his minor child, relinquish to his child all the right which he would otherwise have to the services of his child, and authorize those who employ the child to pay to her her earnings. And when the father does relinquish to his child his claim to the services of such child, the profits of the in-

fant's labor belong to herself, and she can, in her own name, maintain an action to recover the wages due her for her services. 1 *Black. Com.*, 453; 2 *Kent's Com.*, 194; *Janney vs. Alden*, 12 *Mass. R.*, 37; *Morse vs. Welton*, 6 *Conn. R.*, 547; *Burlingame vs. Burlingame*, 7 *Cowen*, 92; *Whiting vs. Earle*, 3 *Pick. R.*, 201; *Snediker vs. Everingham*, 3 *Dutcher N. J. R.*, 143; *Janneson vs. Graves*, 2 *Black. Ind. R.*, 143; *Chase vs. Smith*, 5 *Vt. Rep.*, 556; *Shute vs. Dorr*, 5 *Wend.*, 204; *Canovan vs. Cooper*, 3 *Barbour*, 115; *Corey vs. Corey*, 19 *Pick.*, 29.

The intention of the parent may be inferred from circumstances, and where the circumstances of any particular case warrant the conclusion, that it was understood that the child might receive her earnings, payment to her will be good. *Burlingame vs. Burlingame*, 7 *Cowen*, 92; *Benson vs. Remington*, 2 *Mass.*, 115.

At what age does a female in this State arrive at full and lawful age, so as to be entitled to her own personal services, free from any legal control or restraint by her father or mother? In England the father is unquestionably entitled to the care and custody of his children, male and female, until they are twenty-one years of age; and to the value of their labor and services so long as they live with him and are maintained by him. And this is the law of most, if not all the American States. But in this State the law is quite different, having been changed and regulated by the Legislature. According to the true and legal construction of the several Acts of Assembly of this State, a female is of full and lawful age, for most purposes, at the age of eighteen years, and we insist, that she is at that age released and discharged from all restraint and control of her father or mother, and entitled to the value of her own personal labor and services. The father is not entitled to the property of his infant children as father, but only as guardian. He is not entitled to the value of their labor and services unless they live with him and are supported by him. The true spirit and legal construction of the legislation of this State upon this subject, clearly show that

Greenwood *vs.* Greenwood.

the appellee, at the time of the injury complained of, was not entitled to the value of the labor and services of his daughter, it being admitted that she was at that time over eighteen years of age. Art. 6, sec. 20, of the Code of Public General Laws, is in the following words: "The father may bind out his child as an apprentice on reasonable terms, for any time not longer than the *full age of such child, that is to say, boys till twenty-one, and girls till eighteen years of age.*" The Act of 1798, ch. 101, sub-ch. 12, sec. 15, makes it the duty of the guardian of a female ward, on her arrival at the age of eighteen years, to deliver up, agreeably to the Court's order, to the said ward, &c., all the property of such ward in his hands, &c. By the Act of 1829, ch. 216, and the Act of 1831, ch. 305, secs. 3, 5, Art. 79, secs. 1 to 4, Code of Public General Laws, the rights and powers of females at eighteen years of age, are fully set forth and explained. By Art. 93, sec. 142, of the Code, it is provided, that a legacy made payable to a female on her attaining to full, mature or lawful age, such legacy is payable when the female arrives at the *age of eighteen.* By Art. 93, secs. 144, 145, 146, 154 155, 164, of the Code, a female at the age of *eighteen years,* can devise her real estate. Art. 93, sec. 200, of the Code, seems to be conclusive upon the question, that a female in this State, is considered of full and lawful age at *eighteen,* to receive, take care of and manage her own property, free from the restraint or control of any body, to execute releases, powers of attorney, &c.

It is a well settled principle, that the earnings or wages of minor children, are considered as the property of the father, and he is entitled to receive them while the minor children live with him, and are maintained by him; and by the laws of this State, a female is of lawful age at *eighteen,* and she is entitled to receive all her property from her guardian, and any one else who is in possession of it. If, then, the earnings or wages of a minor female is the property of the father, it is clear, we think, that after the female minor child attains to full and lawful age, that is eighteen years, the fruits of her

labor, being property, must of course belong to herself, and not to her father.

There were doubts entertained at one time, in this State, by the Courts, as to the true meaning and construction of the 15th sec. of the sub-ch. 12, of the Act of 1798, ch. 101. It was contended on one side, that a female in this State, was, at the age of *sixteen*, of full and lawful age to give releases and dispose of her own property as she pleased; but, on the other side, it was contended that she had no rights, except those specially delegated to her by the said 15th sec. of the Act of 1798, ch. 101. The law, as adopted by the Act of 1798, ch. 101, sub-ch. 12, remained unaltered or unchanged until the Acts of 1829, ch. 216, sec. 7, and of 1831, ch. 305, sec. 35. During the intervening time, the Court of Appeals expressed opinions in sundry cases as to the true meaning and effect of the said 15th sec. of the Act of 1798, ch. 101, but it will be found on careful examination, that those opinions have no sort of application to the question now under discussion. *Davis vs. Jacquin & Pomerait*, 5 *Har. & John.*, 100; *Bowers' Adm'x vs. The State, use of Dryden*, 7 *Har. & John.*, 32; *Fridge vs. The State, use of Kirk*, 3 *Gill & John.*, 103; *Crapster vs. Griffin*, 2 *Bland*, 1; *Magruder and Wife vs. Darnall and Wife*, 6 *Gill*, 269.

The question now submitted to the Court, is not based upon the meaning and construction of the Act of 1798, ch. 101, sub-ch. 12, but upon the true construction and policy of all the legislation of this State upon the subject. When all the Acts are carefully examined, it will be found that the policy of our legislation is, that females are to be considered of full and lawful age at *eighteen*, for most purposes, and *particularly*, so far as their personal liberty, personal services and labor are concerned. That the relation of master and servant ceases to exist between father and daughter, when the latter *arrives at the age of eighteen* years. *McKim vs. Handy*, 4 *Md. Ch. Dec.*, 228; *McClellan and Wife vs. Kennedy, et al.*, 8 *Md. Rep.*, 230.

Greenwood *vs.* Greenwood.

*William P. Maulsby, Jr.* and *William P. Maulsby,* for the appellee:

A father may maintain an action for the seduction of his daughter, when under age, *per quod, &c.,* whether she was living with him at the time the offence was committed or not; for, from the legal control he had over her services, the law implies the relation of master and servant, unless in the case of her not living with him, he had, by some act of his own, destroyed that relation. *Mercer vs. Walmsley,* 5 *H. & J.,* 27, 31; 2 *Greenl. Ev., sec.* 576; *Holloway vs. Abell,* 7 *Carr. & Payne,* 528; *Fores vs. Wilson, Peake's Nisi Prius Cases,* 55; *Bartley vs. Richtmyer,* 4 *Comstock,* 43, 44, 47; *Hewitt vs. Prime,* 21 *Wend.,* 81; *Nickleson vs. Stryker,* 10 *John.,* 115; *Martin vs. Payne,* 9 *John.,* 389; *Maunder vs. Venn,* 22 *Eng. Com. L. Rep.,* 323; *Hornketh vs. Barr,* 8 *S. & R.,* 36; *Shute vs. Dorr,* 5 *Wend.,* 205.

A father is entitled to maintain an action for the seduction of his daughter, so long as his right to her services remains unimpaired. In this case, the father never surrendered his right to control the services of his daughter, according to his pleasure. There was no intention on his part to be rid of supporting her — there was no purpose to emancipate her from his right to control her actions. The father in sending his daughter to assist his aged aunt, was actuated by feelings of kindness and affection for his relative, and from a like feeling, he permitted his daughter to retain the small sum which was paid her by the appellant, for the services rendered by her in his mother's house. Did the father by any act divest himself of his right to the services of his daughter? There was no contract for the hiring of the daughter. She went to the house of her relative, on a mission of kindness — wages or hire were not thought of, and formed no part of the inducement to her going. She did not go to render her aunt menial service; she went to assist her in the discharge of her household duties, during the temporary absence of her servant who had been performing such service.

Although the daughter was more than eighteen years of age, she was still under the parental control, and her father's claim to her services remained. *Davis vs. Jacquin & Pomerait,* 5 *H. & J.,* 110; *Bowers' Adm'x vs. The State, use of Dryden,* 7 *H. & J.,* 36; *Keller vs. Donnelly,* 5 *Md. Rep.,* 211; *McClellan and Wife vs. Kennedy, et al.,* 8 *Md. Rep.,* 230; *McKim vs. Handy,* 4 *Md. Ch. Dec.* 228.

For the rule to be observed in the construction of statutes, reference may be had to the case of *Hooper vs. Mayor & C. C. of Baltimore,* 12 *Md. Rep.,* 475.

MILLER, J., delivered the opinion of this Court.

In this action by a *father* for the seduction of his daughter, under twenty-one years of age, *per quod servitium amisit,* the declaration avers the daughter was the plaintiff's servant. In all such cases the loss of service being the *gist* of the action, the relation of master and servant at the time of the seduction must be averred in pleading and established by proof. About this there is no difficulty; all the well considered authorities agree that such an averment must be made and proved. The difficulty lies in determining what proof is necessary to sustain the averment. This is the point of controversy in this case, as it has been in nearly every instance, both in England and in this country, where such cases have been before the Courts. The Court below refused an instruction asked for by the defendant to the effect that there was no evidence in the case legally sufficient to prove, that at the time of seduction, the relation of master and servant existed between the plaintiff and his daughter. The argument on the part of the appellant is, that the proof shows the daughter was not *actually* in the service of her father, but was at the time in the *actual* service of another, and therefore the action cannot be sustained. It is said, this is a common law action, and the English decisions, some of which sustain their position, have been pressed upon us with great earnestness by the appellant's counsel, as the only proper guides to be followed in determining what

the law in such cases is.   Force is sought to be given to this argument, by the fact that our Declaration of Rights secures to the inhabitants of Maryland, the common law of England. Our ancestors, unquestionably, brought with them, to this country, that common law as their birthright, and all our Constitutions have sacredly guarded it as one of the *rights* of the people, but the Courts which the same people have established to administer that law, are made the sole authoritative expositors of it for *them.*   Decisions in England made since the American Revolution, while entitled to the greatest *respect,* are not *binding* authorities upon this Court.   On the contrary, the practice of this, as of other Courts, is to receive their own decisions only as of binding force.   Previous decisions of this Court should not be disturbed except to settle some great rule of property, which the public interest requires to be reviewed, or unless it is plainly seen that glaring injustice has been done, or some egregious blunder committed.   *Hammond's Lessee vs. Inloes, et al.,* 4 *Md. Rep.,* 138.   It is also said the point now presented is a new question in this State.   The subject has, however, been before the appellate Court on two occasions.   In *Mercer vs. Walmsley,* 5 *H. & J.,* 27, decided in 1820.   Judges BUCHANAN and JOHNSON delivered opinions in which they distinctly announce as law, that a *father* may maintain an action for the seduction of his daughter when *under age,* whether she was living with him at the time or not, because from the legal control he had over her services, the law *implies* the relation of master and servant, unless in the case of her not living with him, *he had by some act of his own destroyed that relation;* that she is his servant *de jure,* and by debauching her, an act is done that deprives him of services which he *might* have exacted.   Both Judges questioned the correctness of the decision in *Dean vs. Peel,* 5 *East,* 47, which they say was mainly relied on by the appellee as establishing the position that the *gist* of the action was the *animus revertendi,* and when that existed, whether the seduction took place while living with her father or not, whether a

minor or of full age, was immaterial. The daughter, in *Mercer vs. Walmsley*, was over twenty-one, not living with her father, and not his servant *de facto* at the time; and it was not therefore essential to that decision to declare what the law is in the case of a daughter under age; yet from the course of argument pursued by counsel, and the authorities cited and relied on by them, it was certainly proper for the Court to do so; and that they did it after full deliberation and careful consideration of the cases, and with a design to settle the law, cannot, we think, be questioned.

In *Keller vs. Donnelly*, 5 *Md. Rep.*, 211, decided in 1853, the action was brought by the *mother*; but it was admitted, that the law in case of a *father* bringing the action was correctly stated in *Mercer vs. Walmsley*, which was cited by the Court with approbation as settling the law in this respect, the Court saying that in that case the right of the father to maintain the action was fully recognized, whether the daughter be above twenty-one years of age or not, provided if she be over twenty-one, she be at the time, in the service of the father, but "during her minority the father is entitled to command her services, and the law, therefore, establishes between father and child *constructively* the relation of master and servant." After such announcement of the law, by our predecessors, we should hesitate long before deciding differently, even if we were of opinion it had not been correctly stated. But we are fully satisfied of its correctness. It is supported by a *great preponderance* of authority in this country, and if the English decisions are examined it will be found difficult to sustain the reasons on which some of them are based, without admitting the correctness of the principles thus declared by our own Courts. We refer to the early cases of *Fores vs. Wilson*, *Peake's N. P.*, 55, and *Jones vs. Brown*, *Ibid*, 233, decided by Lord Kenyon, and to *Maunder vs. Venn*, 22 *Eng. C. L. Rep.*, 535, decided by Littledale, J., which were cited in argument. In *Griffith vs. Teetjen*, 28 *Eng. Law & Eq. Rep.*, 371, the defendant's wife having gone out of town, he applied

Greenwood *vs.* Greenwood.

to the plaintiff to allow his daughter, then living with her parents to come and attend to his shop for him; the plaintiff consented and it was *agreed* his daughter should go and stay till the defendant's wife returned, and that the defendant *should pay her something*, but the amount was not stated. She went and remained nearly a month, and when she left the defendant's wife paid her eight shillings. During her stay she was seduced by the defendant, and was delivered of a child at her father's house. The Court held the action maintainable, MAULE, J., putting his judgment on the ground that "there was nothing proved respecting the position the daughter held in the defendant's house, inconsistent with her relation of servant to her father," and CROWDER, J., saying "her absence was merely temporary, *and for the purposes of this action* I think it was not inconsistent with her remaining the servant of her father." Upon this case the American annotator has well observed that *it seems to incline more towards the American decisions.* In *Evans vs. Walton*, decided in the Court of Common Pleas, as late as June, 1867, a girl nineteen years of age was enticed away from her father's house by the defendant with whom she cohabited for a time, but there was no seduction in the legal acceptation of the term, and the father brought an action for enticing away and harboring his *servant*, whereby he had lost her services. It was argued that in such a case there must be some binding contract of service proved, but it was admitted that no such proof was required in a case of seduction. In the course of the argument, BOVILL, C. J., after citing the ruling of Lord KENYON, in *Jones vs. Brown*, asked: "Is there any case where it has been distinctly laid down that there must be something beyond the ordinary contract of service, *which the law will imply* in the case of a son or a daughter?" And in delivering his judgment he denied there was any such authority, or that the case of seduction was anomalous in not requiring such proof.

From these decisions it must be conceded that English Judges of the greatest eminence have held that the law *implies* the relation of master and servant, from the control which the father has over his minor children whilst living with him, and from his right to their services. Why should not this doctrine be carried to its logical result and the child be considered his servant *de jure* so long as the father's control and right to services continue? Blackstone places the father's right to the benefit of his children's labor while they live with and *are maintained by him*, on the same ground as his right to the services of his apprentices and servantś. 1 *Bl. Comm.*, 453. The father is entitled to the custody of their persons and to the value of his children's labor during their minority, because during that period he is bound to maintain them. *Plummer vs. Webb*, 4 *Mason*, 382. From a careful examination of the authorities and the reasons on which they are placed, we cannot doubt the law applicable to this case is correctly stated in *Mercer vs. Walmsley*, and *Keller vs. Donnelly*.

The father may, as these authorities admit, by some act of his own destroy this relation during the minority of his daughter so as to prevent his maintaining such an action. In what manner and by what acts this can be done must depend on the special circumstances of each case. It is sufficient to say here that the proof does not justify the granting of the appellant's prayer, and if we were called upon to draw inferences from the testimony, we should hold the relation had not been destroyed but continued to exist. The daughter was not bound out as an apprentice, nor was there any express agreement by the father with his child to relinquish to her the right which he would otherwise have to her services, nor could such an agreement be implied from the circumstances of this case.

Another position has been taken and urged with much ingenuity and earnestness by the appellant's counsel. They insist the legislation of this State has changed the common

law, and that a female is here to be considered as of full age so as to be entitled to her own personal services, free from any legal control or restraint by her father at the age of eighteen years. The language of the Code of Public General Laws, Art. 6, sec. 20, that "any father may bind out his child as an apprentice on reasonable terms, for any time not longer than the *full age* of such child—that is to say, boys till twenty-one, and girls till *eighteen years of age*," is especially relied on in support of this position. But precisely the same language is used in the old apprentice law of 1793, ch. 45, sec. 4, and has been the law of the State from that day to the present time. The effect of this Act has been strangely misapprehended or overlooked, by the Legislature, the Courts, and the profession, if the position now assumed be correct. The Act of 1798, ch. 101, sub-ch. 12, secs. 1, and 15, conferred the capacity upon a female to receive her property from her guardian at the age of sixteen, (by subsequent law made eighteen,) at which time the guardianship ceased. But in *Davis vs. Jacquin*, 5 *H. & J.*, 100, it was decided that this law merely conferred upon her a new capacity, and did not take away or destroy her state of legal minority, nor remove her other disabilities, and, therefore, though entitled to receive possession of all her personal property at sixteen, she could not dispose of any of it until she attained the age of twenty-one. The same principle was recognized in *Bowers vs. State, use of Dryden*, 7 *H. & J.*, 32. In *Fridge vs. The State, use of Kirk*, 3 *G. & J.*, 103, it was held that a female under twenty-one could not execute a valid release to her guardian, and that in reference to her capacity to execute such an instrument, she was in contemplation of law a minor until she attained the age of twenty-one. The release in that case was a formal one, and was acknowledged and recorded, and this decision was followed by the Act of 1831, ch. 305, making such releases valid, and the 5th section of this law declares that any power of attorney executed for any of the purposes specified in the Act by a female of eighteen, shall be

valid to all intents and purposes "as if such female was of the *full age of twenty-one years.*" These laws have been embodied in, but not changed by the Code. It has also been the uniform practice in our Courts for a female till twenty-one to sue by guardian or *prochein ami,* and to answer in equity by guardian. It has never been doubted that a plea of infancy would avail such female when sued at law, or that her father was bound for her maintenance, and for necessaries furnished her. All this legislation was unnecessaay, all these decisions have been erroneous, and all this practice irregular, if the Act of 1793, ch. 45, *fixed* the *full age* of females, for all purposes, at eighteen. Such a construction cannot be placed upon this law, nor upon any or all of the subsequent Acts conferring special privileges and endowing with special capacities females under the age of twenty-one. The rule of construction applicable to these statutes is that cited from *Dwarris* in *Hooper vs. Mayor and C. C. of Baltimore,* 12 *Md. Rep.,* 475, "as a rule of exposition, statutes are to be construed in reference to the principles of the common law. For it is not to be presumed that the Legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the Act did not intend to make any alteration other than what is specified, and besides what has been *plainly pronounced;*" and the effect of this legislation has been correctly stated by the Chancellor in *McKim vs. Handy,* 4 *Md. Ch. Dec.,* 236, that is, that these Acts do not abridge, to every intent and purpose, the period for which at common law the minority of females continues, but merely confers upon females between eighteen and twenty-one certain capacities which they would be otherwise incompetent to exert, and that they still remain subject to all the disabilities incident to a condition of legal minority, except those which these Acts have removed.

The legal *control* of the father over the person of his daughter, and his *right* to her services until she attains twenty-one, have not been affected by any legislation of the

Greenwood *vs.* Greenwood.

State, and must be held to continue up to that period, nor do we apprehend any such evils, as counsel have supposed, will result from deciding that she is the servant of her father until twenty-one, though entitled to receive her property without guardianship at eighteen.    Courts of Equity have ample power to interfere even with the parental relation, when a proper case for its exercise is made out, and when it becomes necessary for the safety, protection and obvious benefit of the child.    They will not suffer parental authority to be abused, nor the infant's property to be wasted or destroyed in the interval between eighteen and twenty-one, even though there may be no provision for the legal guardianship of such property during that period.    In our judgment much greater evils would result from a decision severing the obligation of parental duty, and permitting females to leave their homes, freed from all parental authority, at the age of eighteen.  The common law has wisely limited the period during which the child is to be under the father's control, and is entitled to look to him for support, and it cannot be changed without some positive act of the Legislature directed to this especial end

It follows from these views, there was no error in the ruling of the Court below, and the judgment must be affirmed.

*Judgment affirmed.*

(Decided 19th March, 1868.)